**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: ) | CHAPTER 11 |
| ) | |
| Harvey A. Graham, Jr., ) | Case No. 09-08423-dd |
| ) | |
| Debtor. ) | |

**PLAN OF REORGANIZATION**

Filed by the Debtor-in-Possession on May 10, 2010

**Table of Contents**

**Page**

| | | |
|---|---|---|
| Article I | History and Other General Definitional Information Relating to the Proposed Plan of Reorganization-------------------------------------- | 2 |
| Article II | Plan of Reorganization ----------------------------------------------- | 5 |
| Article III | Feasibility of Proposed Plan of Reorganization---------------------------- | 14 |
| Article IV | Means of Effectuating Plan ------------------------------------- | 15 |
| Article V | Status of the Debtor After Confirmation --------------------------------- | 16 |
| Article VI | Executory Contracts -------------------------------------------------- | 16 |
| Article VII | Jurisdiction ----------------------------------------------------- | 17 |
| Article VIII | Post-Confirmation Acts -------------------------------------------- | 17 |
| Article IX | Cram-Down for Impaired Creditors Not Accepting the Plan --------------- | 17 |
| Article X | Discharge of the Debtor -------------------------------------------- | 18 |

## PLAN OF REORGANIZATION

The Debtor-in-Possession, The Reserve Golf Club of Pawleys Island LLC ("Debtor"), proposes the following Amended Plan of Reorganization ("Plan") pursuant to Chapter 11 of the U. S. Bankruptcy Code.

## ARTICLE I

**History and Other Definitional Considerations Relating to the Plan of Reorganization**

1. <u>Background</u>.  The history and background of the Debtor are provided in the Debtor's Disclosure Statement filed on May 10, 2010 ("Disclosure Statement").

2. <u>Financial Condition of the Debtor</u>.  The current financial condition of the Debtor is set forth in the bankruptcy schedules and the Exhibit A to the Disclosure Statement.

3. <u>The Debtor's Reorganization Proceedings under Chapter 11</u>.  The information found in the Disclosure Statement provides adequate history as to the proceedings by the Debtor in this reorganization.

4. <u>Definitions</u>.  The following words, terms and definitions shall be used and apply exclusively for this Plan:

   a. <u>Acceptance</u>.  A specific class of claims has accepted a plan when such plan has been accepted by <u>those voting</u> individual creditors in that class that hold at least two-thirds (2/3) in amount (of money) and more than one-half (1/2) in number (greater than 50%) of the <u>voting</u> individual allowed claims of that class of creditors.  A class of interest has accepted a plan if such plan has been accepted by holders of such interest that hold at least two-thirds (2/3) in the amount of the allowed interest of such class held by holders of such interest (i.e., number of shares held by shareholders or partners) <u>that have voted</u> in confirmation of such plan.  <u>It is important to note that computation in the confirmation voting process is based only upon the total amount of claims actually voting rather than on claims proven and allowed</u>.  Notwithstanding any other provision of this section, a class that is unimpaired under this Plan is deemed by law to have accepted this Plan, and solicitation of acceptances with respect to such class is not otherwise required.

   b. <u>Approved Claim</u> shall mean each individual creditor's claim or claim of interest whose validity is accepted by the Debtor for payment, or if challenged by the Debtor, a claim which is ultimately proved by that claimant and approved by the Court after notice.  Some claims by law can be approved only by the Court for payment, e.g., administrative and priority claims.

   c. <u>Cash on Hand</u> shall refer to that cash available, on or immediately after confirmation, and which is in the hands of the Debtor, and has been derived from the total operations of the Debtor.

   d. The <u>Case</u> shall mean this proceeding under Chapter 11, which

        commenced in this Court on November 10, 2009.

e.    Chapter 7 shall mean a hypothetical case which is administered under 11 U.S.C. Sections 701 et seq., wherein an estate, identical to the Debtor, with identical assets and liabilities, has its assets liquidated.

f.    Chapter 11 shall mean a case being administered under 11 U.S.C. Sections 1101 et seq., for the reorganization of the indebtedness of the Debtor.

g.    Claims shall mean any right or claim to a right to receive payment of monies from the Debtor or right to an equity interest in the Debtor held by any party.

h.    Class of Claims shall mean all types of claims or interests (e.g., secured, priority, unsecured or interests) which are substantially identical in kind or nature and are grouped together without any unfair discrimination or treatment for payment by this Plan.

i.    The Code is 11 U.S.C. Sections 101, et seq., the "Bankruptcy Code."

j.    Confirmation of this Plan shall be effective when the signed Order Confirming Plan is filed by the Court to implement the proposed Plan, after the Court has found that the Plan: (1) has been accepted by the requisite number of creditors and parties in interest eligible to vote thereon, (2) is feasible, (3) is fair and equitable, (4) does not unfairly discriminate, and (5) meets all of the other requirements of 11 U.S.C. Section 1123, Section 1126 and Section 1129, and the Order Confirming Plan is entered. The "Effective Date of Confirmation" for cash distribution purposes as it is referred to in this Plan, however, shall mean thirty (30) days from the date the Order Confirming Plan is filed by the Court unless otherwise provided for by the Plan.

k.    The Court shall mean the United States Bankruptcy Court for the District of South Carolina.

l.    The Debtor shall mean Harvey A. Graham, Jr., the Debtor in Possession in this case.

m.    The Disbursing Agent shall be the Debtor's Accountant, Lewis & Lewis CPAs, PLLC after confirmation.

n.    Disposable Income or Annual Disposable Income shall mean the current average income received by the Debtor less amounts reasonably necessary to be expended for the maintenance and support of the Debtor. As set forth in the Disclosure Statement and hereinbelow, the Debtor proposes up front annual distributions of Disposable Income to creditors in the amount of $15,000.

o.    Executory Contracts shall mean all contracts or agreements not completed and to be performed or satisfied by the parties in the future.

      i.    Personalty Leases shall mean all leases between the Debtor and third parties for the use of any and all personal property.

3

      ii.    Realty Leases shall mean all valid, enforceable leases of real estate between the Debtor and other parties.

p.    Final Consummation shall refer to the date and time at which the execution of all provisions of the Plan, appropriate requirements of the Bankruptcy Code, and applicable supplemental orders issued by the Bankruptcy Court have been fully complied with and accomplished.

q.    Impaired Class shall mean a class of claims given, under this Plan, less than the full amount of their filed and approved individual claims or claims where contract rights are modified or compromised by the Plan.

r.    The Plan shall mean this Plan of Reorganization of the Debtor under Chapter 11, filed with the Court on May 10, 2010.

s.    Priority and Administrative Claims shall mean all claims entitled to priority status under 11 U.S.C. Section 507 and Section 364 or other specific provisions of the Code. These claims include, but are not limited to, generally, all costs and expenses incurred during the reorganization proceeding; all wages allowed priority status which were owing by the Debtor at the time of filing up to $10,950 per claimant; all post-petition wage claims due at confirmation; all taxes owing to the United States, any individual State or local taxing authority; all post-petition debts incurred and unpaid since the commencement of this Case; and all other statutory costs or fees assessed or assessable by the Court, and any claims given priority status during this proceeding by specific order of the Court.

t.    Secured Claim shall mean each individual claim completely or partially secured by real estate mortgages, security agreements, assignment agreements, consignment agreements, chattel mortgages, recorded lease-purchase agreements, liens or any other legal encumbrance which is entitled to secured status under Title 36 of the Code of Laws of South Carolina (UCC provisions) or South Carolina law.

u.    Substantial Consummation shall refer to that date and time on which the transfer of all or substantially all of the property proposed by the Plan to be transferred has been achieved; the assumption by the Debtor under the Plan of the actions called for by the Plan has been achieved; and, finally, the commencement of the distribution of some payments under the Plan has begun.

v.    Unimpaired Class shall mean a class of claimants whose rights are not affected by this Plan, or which is entitled to and shall receive under this Plan full satisfaction of its filed and approved claims as required by the Code. Unimpaired claims are deemed to have accepted this Plan by specific provision of the Code and solicitation of acceptances with respect to such class from the holders of claims or interest of such class is not required.

w.    Unsecured Claims shall mean all claims against the debtor other than Secured Claims, Priority and Administrative Claims, or Claims of Interest.

**NOTE:**  The defining of the various parties in interest and claimants against this estate in no way imputes any relative priority among them nor is it to be construed to validate or approve any of their claims.

## ARTICLE II

### Plan of Reorganization

The Debtor's Plan calls for the liquidation or surrender of the Debtor's material non-exempt assets, and annual payment of disposable income for five (5) years commencing on the one year anniversary of the Effective Date of Confirmation (as defined in the Plan) and continuing on each anniversary thereafter until five such annual payments have been made.  The Debtor specifically reserves its right to object to claims asserted against his estate in this matter as well as his right to bring any causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

Pursuant to the Plan, the Debtor proposes to market and sell all of his remaining real estate holdings except his personal residence located at 739 Bear Lake Drive.  Debtor proposes to retain the assets listed as exempt in his bankruptcy schedules, as well as his household goods and furnishings and vehicles.  All other assets shall be contributed to the Plan for liquidation.

Debtor and his non-debtor spouse have reached an agreement with Crescent Bank as to a restructuring of the loan related to their personal residence (as set forth in more detail hereinbelow), and asserts that to the extent any equity exists in Debtor's personal residence, such equity constitutes exempt property.  All other real property interests of the Debtor will be marketed and sold or abandoned to secured creditors (as set forth in more detail hereinbelow), with proceeds first being paid to satisfy any and all debts secured by such collateral and then the estate's share of such proceeds to be used to pay unsecured debts of the estate.  Debtor further proposes to market and sell or abandon all of his stock and ownership interests (as set forth in more detail hereinbelow) in businesses, to the extent such interests have any value, with proceeds to first be used to pay any debts secured by such interests with any remaining proceeds to be distributed to unsecured creditors of the estate.  As shown herein, the Debtor has ownership interests in certain closely held family businesses, including interests in Graham Bros. Farm Supplies, LLC, Carolina Linen Systems, Inc., and Graham Family Investments, LTD. LP. Debtor believes such interests likely have more value to Debtor's family members and/or the entities themselves than they might otherwise have to unrelated third parties.  Therefore, the

Debtor proposes to allow his family members and/or the entities themselves a limited exclusive right to submit an offer to purchase such ownership interests. Such exclusive right shall terminate upon the earlier of two (2) years or the Court's rejection of any such family member or entity's offer to purchase.

All sales contemplated by the Plan shall remain subject to notice to all creditors and parties in interest, who shall be afforded an opportunity to object to such future sales, and shall be contingent upon Court approval.

Due to recent changes in circumstances related to his health problems and the closing of a number of the Debtor's business entities, the Debtor's income and expenses are significantly different than were anticipated at the outset of this case. The Debtor is in poor health, having suffered a heart attack and stroke closely together just prior to the filing of the voluntary petition in this matter. Due to his physical condition, the Debtor is unable to find full time employment for the foreseeable future. However, certain family owned businesses, namely Brothers Farm Supply and Carolina Linen Supply, Inc., have committed to paying salaries to the Debtor throughout the life of the Plan, as shown in the **Exhibit A** to the Disclosure Statement, for consulting work so long as such entities remain in business. Though the original Schedules I and J filed in this matter indicated the Debtor had no significant disposable income to contribute to a plan of reorganization, the Debtor asserts that he has an average monthly disposable income of approximately $1,250 as shown in **Exhibit A** to the Disclosure Statement. The primary source of the Debtor's disposable income in this matter will be distributions pursuant to a government tobacco buyout program of approximately $16,800 per year for the next four (4) years.

Based on the foregoing and given the annual nature of the tobacco settlement payment, the Debtor will pay disposable income of $15,000 per year to creditors through this plan. The Debtor will begin annual disposable income payments to the estate's accountant, Lewis & Lewis CPAs, PLLC (the "Disbursement Agent") in the amount of $15,000 beginning on the Effective Date of the Plan. Immediately upon the later of the final determination of allowed claims or the Effective Date of the Plan, the Disbursement Agent will begin making the annual disposable income payments to the appropriate creditors as set forth below, and will continue such annual disposable income distributions for the next four (4) years thereafter on the anniversary of the initial disposable income payment.

If at any time during the life of the Plan the Debtor should become deceased, the Plan

shall immediately be treated as a liquidating Plan and all non-exempt assets to be liquidated pursuant to the Plan will continue to be liquidated for the benefit of the creditors of the estate. However, upon such an occurrence, there will no longer be an annual payment of disposable income. Additionally, should the Debtor become unable to earn an income sufficient to pay the annual disposable income payment due to his health problems, the Debtor or his authorized representatives reserve the right to petition the Court to waive or modify his obligation to make any further disposable income payments under the Plan.

Pursuant to the Plan, the Debtor's creditors will be treated as set out in the classifications below:

Class 1.    Branch Banking and Trust Company ("BB&T").   Secured, impaired.

BB&T asserts a claim against the Debtor in the approximate amount of $4,075,813.26, secured by certain stock and real property assets of the Debtor as well as assets of Graham Family Investments, LTD. LP (the "Family Partnership"). On or about March 31, 2010, BB&T was granted relief from the automatic stay to pursue its rights against collateral owned by the Debtor. The Debtor hereby abandons any and all interest in the BB&T collateral, including the farm shown on Exhibit A of the Debtor's schedules as well as any and all stock in which BB&T holds an interest.

As set forth above, BB&T's claims are secured by assets of the Debtor and the Family Partnership. In addition, the Debtor is a guarantor of certain loans made by BB&T to the Family Partnership. However, the Debtor asserts that the Family Partnership and other family related entities have pledged collateral to BB&T to secure payment of the loans guaranteed by the Debtor, which are sufficient to fully secure BB&T as to the payment of such guaranteed debts. The Debtor asserts that the value of the assets pledged to BB&T by the Debtor and the Family Partnership exceed the value of BB&T's claims against the Debtor. Therefore, the Debtor asserts that BB&T is fully secured and will receive payment in full from its various collateral surrendered by the Debtor and pledged by the Family Partnership and other family related entities.

Based upon the foregoing, BB&T will receive payment of their claims in full from the collateral abandoned by the Debtor and liquidation of the collateral held by third party family related business entities. Upon confirmation of the Plan, BB&T shall be deemed to have no remaining claims against the Debtor or his estate.

Class 2.    National Bank of South Carolina ("NBSC").    Secured, impaired.  NBSC asserts a secured claim against the Debtor of approximately $61,292.58 secured by a first priority mortgage on Unit 1206 Ashworth Condo, North Myrtle Beach, SC (the "Ashworth Condo"). Mr. Graham and his wife jointly own the Ashworth Condo, each asserting a 50% ownership interest.  Mrs. Graham also appears to be a co-debtor on this NBSC debt with the Debtor.

The Debtor is attempting to sell the Ashworth Condo for an amount greater than this NBSC secured claim, and believes that it may be close to reaching an agreement to sell such property.  NBSC is fully secured as to the $61,292.58 (Loan #: 4850-004) claim secured by the Ashworth, and will be paid in full on this debt upon a sale of the Ashworth Condo.  The Debtor is currently paying the mortgage on the Ashworth Condo from its lease revenues and will stay current with NBSC on the Ashworth Condo mortgage payment going forward until such asset is sold.  The Debtor will market and sell the Ashworth Condo as soon as practicable during the course of this Plan.

NBSC also asserts a claim against the Debtor in the amount of $318,159.30 (Loan # 9450-006).  However, this debt is not secured by estate assets, rather is secured by a 120 acre farm off Highway 701 in Loris, SC, an asset owned by one of the third party family business entities.  The Debtor believes that this $318,159.30 note is oversecured and can and will be paid in full from the third party collateral.  However, to any extent NBSC asserts any deficiency claim against the Debtor after pursuit and liquidation of the third party collateral, such claim will be unsecured as to the Debtor and such claim will be treated as a Class 10 general unsecured claim (as set forth in more detail hereinbelow).

Upon successful sale by the Debtor of the Ashworth Condo, the $61,292.58 secured debt to NBSC will be paid in full.  Any and all remaining claims of NBSC shall be general unsecured deficiency claims included as a part of Class 10 below.

Class 3.    Crescent Bank.    Secured, impaired.  Crescent Bank asserts two (2) claims against the Debtor.  First, Crescent Bank asserts a secured claim (Note #:4098) against the Debtor in the approximate principal amount of $485,000 (with asserted interest owing of $11,542.31 and accrued late fees of $476.40 as of April 30, 2010), which loan appears to be secured by a first priority mortgage on a 177.7 acre farm owned by the Family Partnership. Second, Crescent Bank asserts a secured claim (Note #:3880) against the Debtor in the

8

approximate principal amount of $315,403.15 (with asserted interest owing of $12,764.53, fees of $3,094.20, and late fees of $566.75 as of April 30, 2010), which loan appears to be secured by a first priority mortgage against the Debtor's personal residence. Crescent Bank asserts that both claims against the Debtor are cross-collateralized. Crescent Bank further asserts that both loans are set to mature in calendar year 2010.

The Debtor has reached an as of yet undocumented agreement to restructure the Crescent Bank Loans, which agreement, the Debtor believes will be documented on or before May 13, 2010. Pursuant to the agreement, the Debtor will enter into a new home loan in the amount of $315,403.15, thereby replacing Note #:3880. Upon restructuring of this debt, a third-party non-debtor family member has agreed to pay the $16,425.48 (as of April 30, 2010) in accrued interest and fees in order to bring the home loan current. The terms of the new home mortgage loan will be a 30 year amortization, 6% interest rate, with a three (3) year call. The Debtor will continue to make monthly mortgage payments to Crescent Bank for the term of the loan. At the end of the three (3) year term, the Debtor or some other entity will either pay the balance in full or refinance the loan in order to pay Crescent Bank in full. The new home loan will provide that upon payment of the debt in full, Crescent Bank will release the home as collateral for the other loan (Loan #:4098).

Additionally, Crescent Bank will enter into a loan modification agreement with a new family business entity on Loan #:4098, whereby the business entity will bring the interest and fees current upon execution of the agreement. Crescent has agreed to allow the business entity to make monthly interest only payments (at 6% interest) for a period of one (1) year, in order to allow the business entity to liquidate all or portions of the 177.7 acre farm or to refinance the loan in order to pay Crescent in full.

Upon payment in full of the new home mortgage in the amount of $315,403.15, Crescent Bank shall have no remaining claims against the estate.

<u>Class 4</u>.    <u>Jeffrey Barber, Ray Kellum, et al (the "Class Action Judgment Holders")</u>. <u>Secured, impaired</u>. The Class Action Judgment Holders have a judgment enrolled on the records with the Clerk of Court for Horry County South Carolina in the alleged amount of $856,540.92 (the "Judgment"). The Judgment has not been recorded in any other counties. As a result of the Judgment, the Class Action Judgment Holders have a judgment lien on all of the Debtor's interest in real estate owned by the Debtor that is located in Horry County, South Carolina. Such

real property interests include a second lien on the Farm on Highway 66 and Fox Bay Road, a first lien on the 8.27 Acre Radio Tower Property in Simpson Creek Township, a second lien on the Debtor's interest in the residence on Bear Lake Drive in Longs, SC, and a second lien on the Ashworth Condo.

The Farm property has been abandoned to BB&T, and has no value for the Class Action Judgment Holders, and their second lien position will likely be foreclosed away. The Class Action Judgment Holders' second position on the Debtor's interest in the Bear Lake Drive personal residence has no value either as the Debtor asserts that such interest is wholly unsecured because of the first priority position of Crescent Bank. To the extent any equity exists in the Debtor's interest in the Bear Lake Drive residence above the claim of Crescent Bank, the Judgment lien impairs the Debtor's exemption and the Debtor intends to move to avoid the Judgment lien as to his personal residence.

The Class Action Judgment Holders have recently moved for relief from the automatic stay to pursue their rights against the 8.27 acre Radio Station Tower Property in Simpson Creek Township. The Debtor has not responded to such motion for relief from stay and shall hereby abandon the 8.27 acre Radio Station Tower Property in Simpson Creek to the Class Action Judgment Holders.

The Debtor believes that there is equity in the Debtor's 50% interest in the Ashworth Condo above and beyond the secured claim of NBSC, the first mortgageholder on the Ashworth Condo. As stated in Class 2 above, the Debtor is continuing to pay NBSC from lease proceeds from the Ashworth Condo and is attempting to find a purchaser for the property. Upon sale of the Ashworth Condo, the NBSC mortgage shall be paid in its entirety. Any remaining sale proceeds from the Ashworth Condo will then be split: (1) 50% of such remaining proceeds to the Class Action Judgment Holders (up to the amount of their judgment) for their second lien position on the Debtor's interest in the Ashworth Condo; and (2) 50% of such remaining proceeds to the co-owner, Mrs. Selma Graham, or her successors or assigns.

The Debtor asserts that the claims of the Class Action Judgment Holders are undersecured, and that the Class Action Judgment Holders will also claim a deficiency in the approximate amount of $600,000. To any and all extents that the claims of the Class Action Judgment Holders remain after liquidation of their collateral, such remaining deficiency claims shall be treated as a part of the Class 10 general unsecured claims as set forth below.

Class 5.    Horry County State Bank ("HCSB"). Secured, impaired.    HCSB asserts two (2) claims against the Debtor.  One for a loan to the Debtor and another against the Debtor as a guarantor of a business entity loan.

HCSB asserts a claim against the Debtor in the approximate amount of $850,000, which loan is secured by 720 shares of the Debtor's stock in Carolina Beach Music Broadcasting Corp., the Debtor's radio station entity, as well as a first priority mortgage on a 90.8 acre farm owned by the Family Partnership (a non-debtor 3rd party).  Pursuant to an undocumented as of yet agreement between the Debtor, the Family Partnership, and HCSB, the Debtor will abandon the 720 shares of radio station stock to HCSB and the Family Partnership has agreed to deed to HCSB the 90.8 acre farm.  Additionally, the Debtor has agreed to cooperate in any way that he can with HCSB's foreclosure of the LOG Properties, LLC real property assets securing HCSB's other loan related to this matter (as described further below).  In return, HCSB has agreed not to pursue any non-dischargeability actions against the Debtor and to acknowledge that the Family Partnership has merely pledged collateral and has no further obligations with regard to this loan.  Upon liquidation of the above collateral, the Debtor believes HCSB will assert an unsecured deficiency claim against this estate.  The Debtor estimates the HCSB deficiency from this loan to be approx. $500,000.  To any extent HCSB asserts a deficiency claim such claim will be treated as a part of the general unsecured creditor Class 10 below.

HCSB also asserts a second claim against the Debtor in the approximate amount of $2,416,931.57 (the "LOG Properties Loan") against the Debtor in his capacity as a guarantor on a loan to LOG Properties, LLC (a non-debtor entity owned by the Debtor) and secured by the assets of LOG Properties, LLC.  The LOG Properties Loan is unsecured as to the Debtor.  The Debtor asserts that the LOG Properties Loan is oversecured by the assets of LOG Properties, LLC and will be paid from a state court foreclosure and liquidation of the LOG Properties, LLC property.  To any extent HCSB asserts a deficiency claim relating to the LOG Properties Loan against the Debtor, such claims are unsecured deficiency claims and will be treated as a part of the general unsecured creditor Class 10 below.

Upon abandonment of the radio station stock set forth hereinabove and the Family Partnership 90.8 acre farm to HCSB, HCSB shall have no remaining secured claims against the estate and all remaining deficiency claims are treated as a part of the general unsecured Class 10 claims below.

Class 6. <u>Administrative Claims</u>. <u>Priority, impaired</u>. This class consists of the administrative claims of the estate's professionals, quarterly fees of the United States Trustee, and the $17,604 administrative claim of Norman Communications NMB, Inc. ("Norman"). The Debtor will pay in full from his DIP Account any and all quarterly fees due and owing to the Office of the United States Trustee.

The Norman claim relates to post-petition rents on a lease in the Debtor's personal name where the Debtor's wholly owned radio station entity operated through the end of February. The radio station entity currently continues to operate, and the Debtor is attempting to have the radio station entity pay all or any portion that it can of the $17,604 claim of Norman.

Where necessary, any and all fees of the estate's professionals will be paid only upon Court approval. There are not currently enough funds contained in the Debtor's DIP checking account to pay the administrative claims of the Debtor.

After the Debtor's payment of quarterly fees of the Office of the United States Trustee and any and all payments from the Debtor's radio station entity to Norman, any and all remaining unpaid administrative claims will be paid over time through the Plan. After the payment of secured creditors with a lien on such assets, unpaid administrative claimants will receive 100% of sales proceeds from any and all asset sales until administrative claims are paid in full. Until paid in full, administrative claimants will share pro rata in any distributions. In addition, until such time as the remaining administrative claims are paid in full, 50% of each annual disposable income payment by the Debtor will be distributed pro rata amongst the remaining administrative claimants. Any unused portion of the 50% disposable income distribution to administrative claimants, as well as the other 50% of the annual disposable income payments, shall be paid to general unsecured creditors as set forth in Class 10 below.

Class 7. <u>Joan M. Graham – Alimony</u>. <u>Priority, unimpaired</u>. Joan M. Graham is the Debtor's former spouse to whom the Debtor is obligated to pay alimony. The Debtor is current on the alimony payments owed to Joan M. Graham, and shall remain current on such payments pursuant to the order/agreement obligating the Debtor to make such payments.

Joan M. Graham has been paid all pre-petition and post-petition alimony payments due her to date, and therefore, Joan M. Graham has no claims against the Debtor's estate other than for his continuing obligation to make such payments.

Class 8. <u>Horry County Treasurer</u>. <u>Priority, unimpaired</u>. The Horry County

Treasurer may assert real property taxes with regard to the 8.27 acre Radio Tower property in the approx. amount of $1,396.23, on the Debtor's farm property on Highway 66 at Fox Bay in the approximate amount of $823.74, and on the Ashworth Condo in the approx. amount of $3,583.95. The property taxes on the foregoing parcels run with the land and shall be paid from the sale price upon the liquidation of any such collateral by the Debtor or their secured creditors. The scheduled property taxes of approximately $3,062.25 with regard to the Clover Court property run with the land and were paid as a part of the Court approved sale of that parcel in February 2010.

Additionally, the Horry County Treasurer may assert real property taxes of approximately $1,913.52 for property taxes on the Debtor's Bear Lake Drive personal residence. Any and all such outstanding real property taxes will be paid by the Debtor and his spouse in the ordinary course.

Class 9.    Oconee County Treasurer.    Priority, unimpaired. The Oconee County Treasurer may assert some claim for real property taxes with regard to the 12007 West Camelia Dr., Clemson, SC property owned by the Debtor. Any such property taxes on the foregoing parcel would run with the land and shall be paid from the sale price upon the liquidation of any such collateral.

Class 10.    General Unsecured Creditors.    Unsecured, impaired. This class consists of all general unsecured creditors of the Debtor, including any contract rejection claims and any remaining deficiency claims of undersecured creditors. In addition, this class consists of all deficiency portions of guaranty and co-obligations of the Debtor with regard to debts that are secured by property of third party entities but wholly unsecured as to the Debtor and his property. In addition to the claims scheduled for and/or filed by general unsecured creditors, this class includes any and all of the Debtor's remaining unsecured, deficiency obligations to BB&T, NBSC, HCSB, Beach First National Bank, Waccamaw Bank, Tescor Support Services, Inc., the Class Action Judgment Holders, and any and all plaintiffs in pending litigation.

As noted in Class 6 above, allowed administrative claims will receive 100% of the funds remaining after the payment of any secured creditors from any and all asset sales until such administrative claims are paid in full. In addition, until such time as the remaining administrative claims are paid in full, 50% of each annual disposable income payment by the Debtor will be paid to the Class 6 Administrative Claims until the Class 6 administrative claims

13

have been paid in full. Until payment in full of Class 6 administrative claims, 50% of each annual disposable income payment shall be distributed pro rata to these Class 10 general unsecured creditors. Upon payment in full of the Class 6 Administrative Claims, 100% of all remaining annual disposable income payments and 100% of all sales proceeds shall be distributed pro rata to these Class 10 general unsecured creditors

Proceeds for this Class 10 will be distributed pro rata to pay the allowed general unsecured claims upon the Debtor after the final determination of such claims. The Debtor reserves the right to object to any claim prior to the closing of the case. The Debtor also reserves its right to bring any potential avoidance actions pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

It is impossible to be precise at this time as to the pro rata percentage payment to general unsecured creditors because of the uncertainty of amounts to be realized by the future liquidation of assets and the uncertainty of the final allowable claims amounts. After a review of the schedules and the filed proofs of claim in this matter and after taking into account the liquidation of all estate and non-estate property held as collateral by secured creditors, the Debtor estimates that the aggregate amount of known unsecured claims will be between the approximate amounts of $5,000,000 and $12,000,000. Based on the Debtor's beliefs as to the aggregate value of collateral to be liquidated through the Plan and the annual disposable income payments to be made into the Plan, the Debtor believes that the pro rata payout to unsecured creditors in this matter will be between 5% and 10%. The Debtor believes the true amount of general unsecured claims in this matter will be closer to approximately $5,000,000, and therefore the Debtor believes and asserts that the pro rata payout to general unsecured creditors will be closer to 10%.

Class 11. Retention of Assets by the Debtor.    Debtor's Retained Interest, impaired. This class consists of the Debtor. Pursuant to the Plan described herein, the Debtor will retain his personal residence at Bear Lake Drive, his household goods and furnishings, and the other exempt assets enumerated on Schedule C of his bankruptcy schedules filed in this matter. The Debtor's interests in any other property shall be extinguished through the liquidation of his interests of such property through the Plan.

## ARTICLE III
### Feasibility of Proposed Plan of Reorganization

It is provided in 11 U.S.C. §1129(a)(11) that in order for a Plan of Reorganization to be

confirmed, it must be demonstrated that the Plan of Reorganization is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor under the Plan unless the liquidation or reorganization is proposed in the Plan of Reorganization.  The Debtor is selling substantially all of its assets to a third party to be approved by the Court, and the Plan is a plan of liquidation.  The net sales proceeds will be distributed to creditors according to this Plan of Reorganization.  The Plan is feasible because a sale date has been set, a purchaser has been identified, that purchaser has sufficient resources on hand to fund the purchase, and those funds will be available for Debtor and purchaser to effect performance under the terms of the sale.  Though creditors and parties in interest should contact their own tax and financial advisors, the Debtor does not believe this Plan has any adverse tax consequences that are known at this time.

## ARTICLE IV
## Means of Effectuating Plan

Overview

The success of the Plan, and any significant recovery to the Creditors of the estate, is dependent upon the successful marketing and consummation of sales of the Debtor's assets and the Debtor's continued receipt of revenues shown in Exhibit A to the Disclosure Statement in this matter.  The Debtor has begun marketing its assets and has received a commitment from two (2) insider family businesses for the continued payments of consulting fees so long as such insider businesses remain going concerns.  Additionally, the Debtor currently holds in excess of $15,000 in his DIP Banking account that will allow the Debtor to make the first Annual Disposable Income payment called for in this Plan.  For the next four (4) years (2011 through 2014), the Debtor will also be receiving annual tobacco settlement payments from the government, which will be the primary source of Annual Disposable Income payments called for in this Plan.

Conditions precedent to Confirmation

The Bankruptcy Court shall have signed, and the Clerk of the Bankruptcy Court shall have entered an order granting approval of the Disclosure Statement and finding that it contains adequate information pursuant to section 1125 of the Bankruptcy Code, and such order shall have become a Final Order.  The Confirmation Order shall have been signed by the Bankruptcy

Court and entered by the Clerk of the Bankruptcy Court.

Implementation on the Effective Date

      This Plan shall not become effective and operative unless and until the Effective Date of Confirmation occurs.  The Effective Date of Confirmation shall be the thirtieth (30th) day after the Order Confirming the Plan is entered by the Court.  Payments and distributions under this Plan, unless otherwise set forth herein, shall commence on the Effective Date.

## ARTICLE V

### Status of the Case After Confirmation

      Upon Substantial Consummation of this Plan, the Debtor will move to close this bankruptcy case, requesting that the Court retain jurisdiction relating to various matters contained in the Plan, including future asset sales.  Upon the completion of payments called for under this Plan, the Debtor will move to re-open the case to request that the Court grant the Debtor a Discharge pursuant to 11 U.S.C. §1141(a)(5).  Upon confirmation of this Plan, the Debtor is exonerated from any and all claims not filed by a creditor or claimant of interest against the Debtor prior to the claims bar date previously set by this Court.  The Debtor will, from and after Confirmation of this Plan, be indebted for, and obligated to pay the claims, liabilities, and obligations set forth in Article II of this Plan, as such obligations may be allowed or modified pursuant to this Plan or pursuant to claims objections and/or motions to value.  Except as otherwise allowed by the Code, upon Confirmation and the continuing timely payments called for by the Plan, creditors are stayed from bringing actions against the Debtor to collect debts in a manner inconsistent with the terms of this Plan.

      The Debtor intends to and retains the right to object to claims subsequent to confirmation.

## ARTICLE VI

### Executory Contracts

      Any and all other executory contracts shall be deemed rejected.  Contract rejection claims, to the extent any exist, shall share pro rata with other creditors in the Class 10 General Unsecured Class.  Except as to the previously approved administrative claim of Norman Communications NMB, Inc. ("Norman"), Norman has expressly waived the assertion of any unsecured claims against the Debtor as it relates to the Debtor's lease for his radio station entity.

16

# ARTICLE VII

## Jurisdiction

1. <u>Retention of Jurisdiction</u>. The Court shall retain jurisdiction over the Debtor, its property, and all other parties appearing in the reorganization proceeding as provided by this Plan or by Order of the Court. The Court shall retain jurisdiction as provided in the Bankruptcy Code until entry of the final decree closing the bankruptcy case. To the extent that may be necessary, Debtor may request that the Court enter a final order closing the case but retaining jurisdiction for a limited purpose, including, but not limited to, presiding over any adversary proceeding or claim objection that may be pending at the time of the closing of the main bankruptcy case or over future asset sales as contemplated in this Plan.

2. <u>Prosecution and Defense of Claims</u>. The Debtor shall retain full power after Substantial Consummation to prosecute and defend any causes of action or proceedings existing at Substantial Consummation by or against it, or resulting from the administration of the estate of the Debtor or resulting from any other claim by or against the debtor or its assets, or arising prior to or existing before Substantial Consummation.

# ARTICLE VIII

## Post-Confirmation Acts

1. The Debtor, and its agents, shall perform all acts necessary to complete and consummate this Plan, to include:

   a. Prosecution of all claims against third parties by the Debtor and objections to claims filed by third parties;

   b. Execution and filing of all legal documents required; and

   c. Performing any and all functions required by the Code and this Plan.

2. The Debtor shall cause to be filed with the Court an itemized list of all receipts of and disbursements by the Debtor after confirmation. Such report must be approved by the Court before the final decree is issued discharging the Debtor in this reorganization proceeding.

# ARTICLE IX

## "Cram Down" for Impaired Creditors
## Not Accepting the Plan

In respect to any class of creditors impaired but not accepting the Plan by the requisite majority in number and two-thirds in amount, the proponent of this Plan requests the Court to find that the Plan does not discriminate unfairly and is fair and equitable with respect to each

class of claims or interest that is impaired under the Plan and that the Court confirm the Plan without such acceptances by the said impaired classes.

## ARTICLE X

### Discharge of the Debtor

The entry of an Order Confirming Plan <u>does not</u> by itself act as a discharge of the Debtor's liabilities. Though the Debtor will move to close the case upon Substantial Consummation, the Plan is a case in which the Debtor is an individual as set forth in 11 U.S.C. §1129(a)(15), and unless otherwise ordered by the Court in this matter, the Debtor shall not receive a discharge until all payments called for under the Plan have been made pursuant to 11 U.S.C. §1141(a)(5).

Upon the Debtor's obtaining a Discharge after the payments called for herein, any defaults whatsoever with respect to any indebtedness or obligations of the Debtor existing prior to Confirmation shall be deemed to have been waived and shall not thereafter be a basis for the exercise by any person for any right or remedy whatsoever, as a creditor or claimant against the Debtor.

RESPECTFULLY SUBMITTED on this the 10th day of May 2010, at Columbia, South Carolina.

MCCARTHY LAW FIRM LLC

BY: /s/ Daniel J. Reynolds, Jr.
G. William McCarthy, Jr., I.D. #2762
Daniel J. Reynolds, Jr. I.D.#9232
Sean P. Markham I.D. #10145
Attorneys for the Debtor
1715 Pickens Street (29201)
Post Office Box 12287
Columbia, South Carolina  29211
Tele:  (803) 771-8836
Fax:  (803) 779-0267