**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Harvey A. Graham, Jr., | ) | Case No. 09-08423-dd |
| | ) | |
| Debtor. | ) | |

**DISCLOSURE STATEMENT**

Filed by the Debtor-in-Possession on May 10, 2010

**Table of Contents**

                                                **Page**

I.      Introduction ------------------------------------------------------------- 2

II.     History and Events Leading to Bankruptcy -------------------------------- 3

III.    Post-Petition Activity --------------------------------------------------- 4

IV.     Property of the Debtor --------------------------------------------------- 7

V.      Summary of Proposed Plan ------------------------------------------------ 6

VI.     Liquidation Analysis ---------------------------------------------------- 19

VII.    Feasibility of Plan ----------------------------------------------------- 21

VIII.   Tax Consequences-------------------------------------------------------- 21

IX.     Conclusion -------------------------------------------------------------- 21

## DISCLOSURE STATEMENT

## I.      INTRODUCTION

Harvey A. Graham, Jr. (the "Debtor") provides this Disclosure Statement to all of his known creditors and parties in interest in order to disclose information considered by the Debtor to be important, material and necessary for the creditors to make a reasonably informed decision in exercising their right to vote on the Plan of Reorganization of the Debtor (the "Plan") which has been summarized herein and will be filed with this Disclosure Statement (the "Disclosure Statement") in the United States Bankruptcy Court for the District of South Carolina.   This Disclosure Statement must provide such information, as far as practicable, that would enable a hypothetical reasonable investor typical of the holders of claims against the Debtor, to make an informed judgment about the Plan.   The Debtor feels that the information provided in this Disclosure Statement gives information which is adequate for an investor to make such a decision.   The United States Bankruptcy Court will set a hearing to determine if this Disclosure Statement provides adequate information and conforms to the requirements of the Bankruptcy Code  (11 U.S.C. §101 et seq.).

The United States Bankruptcy Court will set a date at a later time for a hearing on the acceptance of the Plan or may combine the Disclosure Statement and Plan hearing.  Notice of the hearing will be mailed to all holders of claims, and upon receiving the Notice of Hearing, holders of claims may vote on the Plan by completing the ballot mailed with the Plan and Notice of Hearing and then returning the ballot to the Bankruptcy Court.   The Notice of Hearing will specify a time within which the ballots must be returned.   The vote of all creditors and holders of claims is very important.  The Plan will be confirmed by the Court if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the creditors or holders of claims in each class voting on the Plan, and two-thirds (2/3) in number of the holders of allowed interests voting on the Plan.   In the event the requisite number of acceptances is not obtained, the Court may still confirm the Plan if the Court finds the Plan accords fair and equitable treatment to those classes rejecting the Plan.

The Debtor reserves the right to object to any claim prior to the closing of the case.   The Debtor also reserves its right to bring any potential avoidance actions pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

The Plan represents a legally binding arrangement and should be read in its entirety,

rather than relying on the summary in this Disclosure Statement.  Approval of the Disclosure Statement by the United States Bankruptcy Court does not constitute approval by the Bankruptcy Court on the merits of the Plan.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND HAS BEEN PREPARED BASED ON INFORMATION AVAILABLE TO THE DEBTOR.  NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY THE VALUE OF THE ASSETS OF THE DEBTOR) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  THOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

## II.      HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF BANKRUPTCY

The Debtor was born on April 12, 1944 to Harvey Graham, Sr. and Selma Graham.  The Debtor is a graduate of Clemson University.   Upon his father's death, the Debtor took over management of the family businesses, which included Graham Brothers Farm Supply, LLC, Carolina Linen Services, Inc., Brick Warehouse, LLC and Graham Family Investments, LP.  In September 2002, Mr. Graham formed and opened Carolina Beach Music Broadcasting, Inc., an FM Radio station in North Myrtle Beach, SC.  In June 2001 the Debtor purchased a building and land, and he formed Coastal Entertainment, LLC in April 2002.   When it operated, Coastal Entertainment, LLC operated a night club.

The property on which Coastal Entertainment, LLC previously operated was later used as a site for a planned 400 unit condo project by the Debtor.  The night club was closed and the building was removed from the lots in November 2006, so the condo project could be built.  The condo project operated under the name of LOG Properties, LLC f/k/a BCG Properties. Unfortunately, after pre-selling condo units that were not yet built, the condo project became entangled in multiple lawsuits, which lawsuits eventually halted the construction of the condo project.  LOG Properties, LLC had to refund the hundreds of pre-sale down payments on the project.  The costs that had been incurred on the project as of that time were in excess of $8,500,000.00, which costs had been funded by loans from several banks and secured by properties owned by LOG Properties, LLC, the Debtor, and several of the family businesses including, most notably, Graham Family Investments, LTD. LP.

Simultaneously with the legal and other problems the Debtor endured relating to LOG Properties, LLC there was a significant downturn in the economy, which resulted in a reduction of income from all of the family business and businesses owned by the Debtor. This economic downturn was fatal to any chance of success with LOG Properties, LLC. Because of the economic downturn in the real estate market in the Grand Strand area, the Debtor was prevented from selling his or his company's holdings in order to reduce or pay the debts owed to the various banks.

In a class action lawsuit, the former depositholders on pre-sales at the LOG Properties, LLC project obtained a judgment against the Debtor and LOG Properties, LLC in 2009 for approximately $850,000. In November 2009, the class action judgment holders were nearing foreclosure sales on properties owned by the Debtor, and a scheduled sale related to a parcel of property owned by the Debtor on which the radio station entity's broadcasting tower is located was the immediate event that precipitated the Debtor's bankruptcy filing on November 10, 2009.

Additonally, in September 2009, the Debtor suffered a heart attack and a stroke within a week of each other, and his ability to operate the various entities and manage his assets were greatly diminished. Though not fully incapacitated, the Debtor remains in poor physical health today.

The Debtor filed his voluntary Chapter 11 Petition on November 10, 2009 to allow himself a breathing spell in order to facilitate a restructuring of his personal debts.

### III.    POST-PETITION ACTIVITY

#### A.    Bankruptcy Filing and Early Case Filings

The Debtor filed his voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 10, 2009. Since that time, the Debtor has managed his assets as a debtor in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. On or about November 18, 2009, the Debtor filed its Application to Employ the McCarthy Law Firm, LLC as its bankruptcy counsel. On or about December 1, 2009, the Court entered its Order Granting the Application to Employ Debtor's Bankruptcy Counsel. On or about November 23, 2009, the Debtor filed its Application to Employ Lewis & Lewis CPAs, PLLC as its Accountant, and on or about December 7, 2009, the Court entered its Order Appointing the Accountant.

#### B.    Sales of Assets

On December 23, 2009, the Debtor filed an Application to employ RE/Max Southern Shores as its Real Estate Agent for the marketing of the Debtor's former residence at 924 Clover Court, Longs, SC 29568.  On January 4, 2010, the Court entered its Order Granting the Debtor's Application to Employ RE/Max Southern Shores to market the Debtor's former residence.  On December 23, 2009, the Debtor filed a Motion to Sell Free and Clear of Liens the Debtor's Interest in the Debtor's former residence at 924 Clover Court for a gross aggregate sale price of $295,000.  Crescent Bank held the first priority mortgage on the Debtor's former residence (as well as the Debtor's current residence) and was owed approximately $585,000 with regard to such mortgage.  The sale of the Debtor's residence called for the net sales proceeds (after payment of the real estate agent's fee and the payment of closing costs) to be distributed in full to Crescent Bank.  Though an objection was initially filed by counsel on behalf of a group of class action plaintiff's holding a judgment lien against the Debtor's former residence, such objection was resolved prior to the January 21, 2010 sale hearing date set by the Court.  On or about January 21, 2010, the Court entered an Order approving the sale of the Debtor's former residence and the payment of net proceeds to Crescent Bank upon the closing of such sale.  The sale of the Debtor's former residence closed on or about February 5, 2010, and the net sales proceeds were paid to Crescent Bank after payment of the real estate commission and necessary closing costs.

On or about March 8, 2010, the Debtor filed an Application to Employ Harry McDowell Realty as its real estate agent for the purpose of marketing numerous other real property holdings of the Debtor.  On or about March 22, 2010, the Court entered an Order Granting the Application to employ Harry McDowell Realty ("McDowell Realty").  McDowell Realty continues to market these real property holdings at this time.

> **C.**    **Motion for 2004 Examination and Extension of Time to Object to Dischargeability**

On February 4, 2010, Horry County State Bank ("HCSB") filed a Motion for a Rule 2004 Examination of the Debtor.  Without objection by the Debtor, on February 8, 2010, the Court entered an Order Granting HCSB's Motion for a Rule 2004 Examination of the Debtor.  On February 19, 2010 and March 26, 2010, the Debtor attended the Rule 2004 Examination held by HCSB.

Also on February 4, 2010, HCSB file a Motion to extend the time to file an objection to the Debtor's Discharge, and without objection by the Debtor, an order was entered extending the

deadline to object to discharge on February 24, 2010. Subsequently, on March 30, 2010 and April 29, 2010, the Court entered consent orders further extending HCSB's time for filing an objection to the Debtor's discharge. HCSB currently has until May 15, 2010 to oppose a discharge of their debt in this matter. The Debtor continues to discuss HCSB's claims and issues and remains hopeful that a mutually agreeable resolution may be reached in this regard.

### D.    Motion for Payment of Administrative Claim

On March 11, 2010, Norman Communications NMB, Inc. ("Norman") filed an Application for Allowance and Payment of Administrative Expenses with regard to post-petition lease payments owed by the Debtor in relation to the offices of Debtor's wholly owned radio station entity. Debtor and Norman agreed that if the radio station entity could quickly vacate the premises and find an alternate location, Norman would only seek payment of post-petition rents through the end of February 2010, and that Norman would waive any and all other claims against the Debtor relating to contract rejection damages. On or about February 28, 2010, the radio station entity moved to an alternate location at a lower rate of rent with a lease in the name of the radio station entity rather than the Debtor. The Debtor and Norman announced Norman's waiver of deficiency claims on the record at the April 20, 2010 hearing on the Application, and on April 20, 2010, the Court entered an Order Allowing Norman's Administrative Claim for post-petition rents. As of the date of this filing, the Debtor has not yet paid Norman and this Disclosure Statement and the Plan set forth in more detail the Debtor's intentions with regard to such payment.

### E.    Motions for Relief from Stay

On March 1, 2010, Branch Banking and Trust Company ("BB&T") filed a Motion for relief from the automatic stay to pursue its rights against the Debtor's collateral. BB&T asserts claims against the Debtor in the amount of $4,075,813.26, and was seeking to obtain relief from the stay to pursue their rights against their assigned collateral, which their Motion states has an approximate value of $2,780,000. After numerous discussions, the Debtor conceded that the collateral was not necessary for an effective reorganization and that the Debtor was not making any post-petition payments toward the debt, therefore the Debtor did not object to BB&T's Motion for Relief from stay. On March 31, 2010, the Court entered an Order granting BB&T relief from stay in order to pursue their rights against their collateral held by the Debtor.

On April 20, 2010, counsel on behalf of certain class action plaintiffs holding a judgment

lien against a parcel of the Debtor's property filed a Motion for relief from stay to pursue a foreclosure of such property.  At the time of this filing, the Debtor is not likely to oppose such relief.

In addition, on April 27, 2010, Crescent Bank filed a Motion for Relief from stay to proceed with a foreclosure against the Debtor's residence.  The Debtor has reached an agreement with Crescent Bank, and expects that Crescent Bank will be withdrawing their motion for relief from stay upon consummation of such agreement.

## IV.    PROPERTY OF THE DEBTOR

Debtor's non-exempt assets consist primarily of ownership interests in various entities, and real property.  Below is a chart containing the Debtor's primary remaining non-exempt assets, including the Debtor's best estimate of the value of such assets to the estate, and a brief description of what the Plan proposes with regard to each such property:

**-- Remainder of Page Intentionally Left Blank.  See following page for Chart--**

| Property Description | Debtor's Interest | Estimated Current Value to the Estate | Proposed Disposition |
|---|---|---|---|
| **Real Property** | | | |
| 12007 West Camelia Dr., Clemson, SC | 50% | $62,500.00 | To be sold, proceeds to pay off any secured/priority debts & then remainder to be paid to Unsecured Creditors |
| Farm (30 Acres - East Side of Hwy 66, 8.27 Acres - Fox Bay Road off Hwy 66, 6.39 Acres - 133 South side of Hwy 9, and 150.2 Acres - Hwy66) | 100% | $1,050,000.00 | surrendered to BB&T |
| Radio Tower Property (8.27 Acres, Simpson Creek Township) | 100% | $200,000.00 | to be surrendered to Class Action Plaintiffs |
| Residence, 739 Bear Lake Drive | 50% | $200,000.00 | to be retained by Debtor & full Debt to be paid by Debtor to Crescent Bank |
| Unit 1206 Ashworth Condo, North Myrtle Beach, SC | 50% | $100,000.00 | To be sold, proceeds to pay off any debts secured by such property & then remainder to be paid to Priority & Unsecured Creditors |
| **Other Non-Exempt Personal Property** | | | |
| 21,000 shares of BB&T Stock | 100% | $534,450.00 | surrendered to BB&T |
| 907 shares of HCSB Stock | 100% | $18,140.00 | To be sold and proceeds distributed to Priority & Unsecured Creditors |
| 502 shares of South Financial Corp | 100% | $356.00 | To be sold and proceeds distributed to Priority & Unsecured Creditors |
| 1,202 Shares of New Century Bank | 100% | $6,779.00 | To be sold and proceeds distributed to Priority & Unsecured Creditors |
| Ownership in CBM Broadcasting Corp. | 100% | $0.00 | surrendered to BB&T and HCSB |
| Brick Warehouse, LLC | 50% | $0.00 | closed business w/ no value |
| Graham Bros. Farm Suplies, LLC | 50% | $74,200.00 | To be sold and proceeds distributed to Priority & Unsecured Creditors |
| Carolina Linen Systems, Inc. | 12% | $82,000.00 | To be sold and proceeds distributed to Priority & Unsecured Creditors |
| LOG Properties, LLC | 99% | $0.00 | business w/ no value - debtor surrenders his interest |
| Pinnacle Payment Solutions | 51% | $10,000.00 | To be sold and proceeds distributed to Priority & Unsecured Creditors |
| Graham Family Investments, LTD. LP | 42.25% | $650,000.00 | To be sold and proceeds distributed to Priority & Unsecured Creditors |

The Debtor and his professionals are also in the process of reviewing the Debtor's financial records with regard to whether the Debtor has any causes of action against third parties, including causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.  At this time, the Debtor believes that the value of any such actions may be minimal at best given the potential counterclaims, setoffs, and defenses of such third parties.

## V.    SUMMARY OF PROPOSED PLAN

The Debtor's Plan calls for the liquidation or surrender of the Debtor's material non-exempt assets, and annual payment of disposable income for five (5) years commencing on the one year anniversary of the Effective Date of Confirmation (as defined in the Plan) and continuing on each anniversary thereafter until five such annual payments have been made.  The Debtor specifically reserves its right to object to claims asserted against his estate in this matter as well as his right to bring any causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

Pursuant to the Plan, the Debtor proposes to market and sell all of his remaining real estate holdings except his personal residence located at 739 Bear Lake Drive.  Debtor proposes to retain the assets listed as exempt in his bankruptcy schedules, as well as his household goods and furnishings and vehicles.  All other assets shall be contributed to the Plan for liquidation.

Debtor and his non-debtor spouse have reached an agreement with Crescent Bank as to a restructuring of the loan related to their personal residence (as set forth in more detail hereinbelow), and asserts that to the extent any equity exists in Debtor's personal residence, such equity constitutes exempt property.   All other real property interests of the Debtor will be marketed and sold or abandoned to secured creditors (as set forth in more detail hereinbelow), with proceeds first being paid to satisfy any and all debts secured by such collateral and then the estate's share of such proceeds to be used to pay unsecured debts of the estate.  Debtor further proposes to market and sell or abandon all of his stock and ownership interests (as set forth in more detail hereinbelow) in businesses, to the extent such interests have any value, with proceeds to first be used to pay any debts secured by such interests with any remaining proceeds to be distributed to unsecured creditors of the estate.  As shown herein, the Debtor has ownership

9

interests in certain closely held family businesses, including interests in Graham Bros. Farm Supplies, LLC, Carolina Linen Systems, Inc., and Graham Family Investments, LTD. LP. Debtor believes such interests likely have more value to Debtor's family members and/or the entities themselves than they might otherwise have to unrelated third parties.  Therefore, the Debtor proposes to allow his family members and/or the entities themselves a limited exclusive right to submit an offer to purchase such ownership interests.  Such exclusive right shall terminate upon the earlier of two (2) years or the Court's rejection of any such family member or entity's offer to purchase.

All sales contemplated by the Plan shall remain subject to notice to all creditors and parties in interest, who shall be afforded an opportunity to object to such future sales, and shall be contingent upon Court approval.

Due to recent changes in circumstances related to his health problems and the closing of a number of the Debtor's business entities, the Debtor's income and expenses are significantly different than were anticipated at the outset of this case.  The Debtor is in poor health, having suffered a heart attack and stroke closely together just prior to the filing of the voluntary petition in this matter.  Due to his physical condition, the Debtor is unable to find full time employment for the foreseeable future.  However, certain family owned businesses, namely Brothers Farm Supply and Carolina Linen Supply, Inc., have committed to paying salaries to the Debtor throughout the life of the Plan, as shown in the attached **Exhibit A** to the Disclosure Statement, for consulting work so long as such entities remain in business. Though the original Schedules I and J filed in this matter indicated the Debtor had no significant disposable income to contribute to a plan of reorganization, the Debtor asserts that he has an average monthly disposable income of approximately $1,250 as shown in **Exhibit A** to the Disclosure Statement.  The primary source of the Debtor's disposable income in this matter will be distributions pursuant to a government tobacco buyout program of approximately $16,800 per year for the next four (4) years.

Based on the foregoing and given the annual nature of the tobacco settlement payment, the Debtor will pay disposable income of $15,000 per year to creditors through this plan. The Debtor will begin annual disposable income payments to the estate's accountant, Lewis & Lewis CPAs, PLLC (the "Disbursement Agent") in the amount of $15,000 beginning on the Effective Date of the Plan.  Immediately upon the later of the final determination of allowed claims or the

Effective Date of the Plan, the Disbursement Agent will begin making the annual disposable income payments to the appropriate creditors as set forth below, and will continue such annual disposable income distributions for the next four (4) years thereafter on the anniversary of the initial disposable income payment.

If at any time during the life of the Plan the Debtor should become deceased, the Plan shall immediately be treated as a liquidating Plan and all non-exempt assets to be liquidated pursuant to the Plan will continue to be liquidated for the benefit of the creditors of the estate. However, upon such an occurrence, there will no longer be an annual payment of disposable income. Additionally, should the Debtor become unable to earn an income sufficient to pay the annual disposable income payment due to his health problems, the Debtor or his authorized representatives reserve the right to petition the Court to waive or modify his obligation to make any further disposable income payments under the Plan.

Pursuant to the Plan, the Debtor's creditors will be treated as set out in the classifications below:

<u>Class 1</u>.        <u>Branch Banking and Trust Company ("BB&T").</u>   <u>Secured, impaired</u>.

BB&T asserts a claim against the Debtor in the approximate amount of $4,075,813.26, secured by certain stock and real property assets of the Debtor as well as assets of Graham Family Investments, LTD. LP (the "Family Partnership"). On or about March 31, 2010, BB&T was granted relief from the automatic stay to pursue its rights against collateral owned by the Debtor. The Debtor hereby abandons any and all interest in the BB&T collateral, including the farm shown on Exhibit A of the Debtor's schedules as well as any and all stock in which BB&T holds an interest.

As set forth above, BB&T's claims are secured by assets of the Debtor and the Family Partnership. In addition, the Debtor is a guarantor of certain loans made by BB&T to the Family Partnership. However, the Debtor asserts that the Family Partnership and other family related entities have pledged collateral to BB&T to secure payment of the loans guaranteed by the Debtor, which are sufficient to fully secure BB&T as to the payment of such guaranteed debts. The Debtor asserts that the value of the assets pledged to BB&T by the Debtor and the Family Partnership exceed the value of BB&T's claims against the Debtor. Therefore, the Debtor asserts that BB&T is fully secured and will receive payment in full from its various collateral surrendered by the Debtor and pledged by the Family Partnership and other family related

entities.

Based upon the foregoing, BB&T will receive payment of their claims in full from the collateral abandoned by the Debtor and liquidation of the collateral held by third party family related business entities.  Upon confirmation of the Plan, BB&T shall be deemed to have no remaining claims against the Debtor or his estate.

Class 2.    National Bank of South Carolina ("NBSC").  Secured, impaired.  NBSC asserts a secured claim against the Debtor of approximately $61,292.58 secured by a first priority mortgage on Unit 1206 Ashworth Condo, North Myrtle Beach, SC (the "Ashworth Condo").  Mr. Graham and his wife jointly own the Ashworth Condo, each asserting a 50% ownership interest.  Mrs. Graham also appears to be a co-debtor on this NBSC debt with the Debtor.

The Debtor is attempting to sell the Ashworth Condo for an amount greater than this NBSC secured claim, and believes that it may be close to reaching an agreement to sell such property.  NBSC is fully secured as to the $61,292.58 (Loan #: 4850-004) claim secured by the Ashworth, and will be paid in full on this debt upon a sale of the Ashworth Condo.  The Debtor is currently paying the mortgage on the Ashworth Condo from its lease revenues and will stay current with NBSC on the Ashworth Condo mortgage payment going forward until such asset is sold.  The Debtor will market and sell the Ashworth Condo as soon as practicable during the course of this Plan.

NBSC also asserts a claim against the Debtor in the amount of $318,159.30 (Loan # 9450-006).  However, this debt is not secured by estate assets, rather is secured by a 120 acre farm off Highway 701 in Loris, SC, an asset owned by one of the third party family business entities.  The Debtor believes that this $318,159.30 note is oversecured and can and will be paid in full from the third party collateral.  However, to any extent NBSC asserts any deficiency claim against the Debtor after pursuit and liquidation of the third party collateral, such claim will be unsecured as to the Debtor and such claim will be treated as a Class 10 general unsecured claim (as set forth in more detail hereinbelow).

Upon successful sale by the Debtor of the Ashworth Condo, the $61,292.58 secured debt to NBSC will be paid in full.  Any and all remaining claims of NBSC shall be general unsecured deficiency claims included as a part of Class 10 below.

Class 3.    Crescent Bank.  Secured, impaired.  Crescent Bank asserts two (2) claims

against the Debtor.    First, Crescent Bank asserts a secured claim (Note #:4098) against the Debtor in the approximate principal amount of $485,000 (with asserted interest owing of $11,542.31 and accrued late fees of $476.40 as of April 30, 2010), which loan appears to be secured by a first priority mortgage on a 177.7 acre farm owned by the Family Partnership. Second, Crescent Bank asserts a secured claim (Note #:3880) against the Debtor in the approximate principal amount of $315,403.15 (with asserted interest owing of $12,764.53, fees of $3,094.20, and late fees of $566.75 as of April 30, 2010), which loan appears to be secured by a first priority mortgage against the Debtor's personal residence.    Crescent Bank asserts that both claims against the Debtor are cross-collateralized.    Crescent Bank further asserts that both loans are set to mature in calendar year 2010.

The Debtor has reached an as of yet undocumented agreement to restructure the Crescent Bank Loans, which agreement, the Debtor believes will be documented on or before May 13, 2010.    Pursuant to the agreement, the Debtor will enter into a new home loan in the amount of $315,403.15, thereby replacing Note #:3880.    Upon restructuring of this debt, a third-party non-debtor family member has agreed to pay the $16,425.48 (as of April 30, 2010) in accrued interest and fees in order to bring the home loan current.    The terms of the new home mortgage loan will be a 30 year amortization, 6% interest rate, with a three (3) year call.    The Debtor will continue to make monthly mortgage payments to Crescent Bank for the term of the loan.    At the end of the three (3) year term, the Debtor or some other entity will either pay the balance in full or refinance the loan in order to pay Crescent Bank in full.    The new home loan will provide that upon payment of the debt in full, Crescent Bank will release the home as collateral for the other loan (Loan #:4098).

Additionally, Crescent Bank will enter into a loan modification agreement with a new family business entity on Loan #:4098, whereby the business entity will bring the interest and fees current upon execution of the agreement.    Crescent has agreed to allow the business entity to make monthly interest only payments (at 6% interest) for a period of one (1) year, in order to allow the business entity to liquidate all or portions of the 177.7 acre farm or to refinance the loan in order to pay Crescent in full.

Upon payment in full of the new home mortgage in the amount of $315,403.15, Crescent Bank shall have no remaining claims against the estate.

Class 4.        Jeffrey Barber, Ray Kellum, et al (the "Class Action Judgment Holders").

<u>Secured, impaired</u>.  The Class Action Judgment Holders have a judgment enrolled on the records with the Clerk of Court for Horry County South Carolina in the alleged amount of $856,540.92 (the "Judgment").  The Judgment has not been recorded in any other counties.  As a result of the Judgment, the Class Action Judgment Holders have a judgment lien on all of the Debtor's interest in real estate owned by the Debtor that is located in Horry County, South Carolina.  Such real property interests include a second lien on the Farm on Highway 66 and Fox Bay Road, a first lien on the 8.27 Acre Radio Tower Property in Simpson Creek Township, a second lien on the Debtor's interest in the residence on Bear Lake Drive in Longs, SC, and a second lien on the Ashworth Condo.

The Farm property has been abandoned to BB&T, and has no value for the Class Action Judgment Holders, and their second lien position will likely be foreclosed away.  The Class Action Judgment Holders' second position on the Debtor's interest in the Bear Lake Drive personal residence has no value either as the Debtor asserts that such interest is wholly unsecured because of the first priority position of Crescent Bank.  To the extent any equity exists in the Debtor's interest in the Bear Lake Drive residence above the claim of Crescent Bank, the Judgment lien impairs the Debtor's exemption and the Debtor intends to move to avoid the Judgment lien as to his personal residence.

The Class Action Judgment Holders have recently moved for relief from the automatic stay to pursue their rights against the 8.27 acre Radio Station Tower Property in Simpson Creek Township.  The Debtor has not responded to such motion for relief from stay and shall hereby abandon the 8.27 acre Radio Station Tower Property in Simpson Creek to the Class Action Judgment Holders.

The Debtor believes that there is equity in the Debtor's 50% interest in the Ashworth Condo above and beyond the secured claim of NBSC, the first mortgageholder on the Ashworth Condo.  As stated in Class 2 above, the Debtor is continuing to pay NBSC from lease proceeds from the Ashworth Condo and is attempting to find a purchaser for the property.  Upon sale of the Ashworth Condo, the NBSC mortgage shall be paid in its entirety.  Any remaining sale proceeds from the Ashworth Condo will then be split: (1) 50% of such remaining proceeds to the Class Action Judgment Holders (up to the amount of their judgment) for their second lien position on the Debtor's interest in the Ashworth Condo; and (2) 50% of such remaining proceeds to the co-owner, Mrs. Selma Graham, or her successors or assigns.

14

The Debtor asserts that the claims of the Class Action Judgment Holders are undersecured, and that the Class Action Judgment Holders will also claim a deficiency in the approximate amount of $600,000. To any and all extents that the claims of the Class Action Judgment Holders remain after liquidation of their collateral, such remaining deficiency claims shall be treated as a part of the Class 10 general unsecured claims as set forth below.

Class 5.   Horry County State Bank ("HCSB"). Secured, impaired.   HCSB asserts two (2) claims against the Debtor. One for a loan to the Debtor and another against the Debtor as a guarantor of a business entity loan.

HCSB asserts a claim against the Debtor in the approximate amount of $850,000, which loan is secured by 720 shares of the Debtor's stock in Carolina Beach Music Broadcasting Corp., the Debtor's radio station entity, as well as a first priority mortgage on a 90.8 acre farm owned by the Family Partnership (a non-debtor 3rd party). Pursuant to an undocumented as of yet agreement between the Debtor, the Family Partnership, and HCSB, the Debtor will abandon the 720 shares of radio station stock to HCSB and the Family Partnership has agreed to deed to HCSB the 90.8 acre farm. Additionally, the Debtor has agreed to cooperate in any way that he can with HCSB's foreclosure of the LOG Properties, LLC real property assets securing HCSB's other loan related to this matter (as described further below). In return, HCSB has agreed not to pursue any non-dischargeability actions against the Debtor and to acknowledge that the Family Partnership has merely pledged collateral and has no further obligations with regard to this loan. Upon liquidation of the above collateral, the Debtor believes HCSB will assert an unsecured deficiency claim against this estate. The Debtor estimates the HCSB deficiency from this loan to be approx. $500,000. To any extent HCSB asserts a deficiency claim such claim will be treated as a part of the general unsecured creditor Class 10 below.

HCSB also asserts a second claim against the Debtor in the approximate amount of $2,416,931.57 (the "LOG Properties Loan") against the Debtor in his capacity as a guarantor on a loan to LOG Properties, LLC (a non-debtor entity owned by the Debtor) and secured by the assets of LOG Properties, LLC. The LOG Properties Loan is unsecured as to the Debtor. The Debtor asserts that the LOG Properties Loan is oversecured by the assets of LOG Properties, LLC and will be paid from a state court foreclosure and liquidation of the LOG Properties, LLC property. To any extent HCSB asserts a deficiency claim relating to the LOG Properties Loan against the Debtor, such claims are unsecured deficiency claims and will be treated as a part of

the general unsecured creditor Class 10 below.

Upon abandonment of the radio station stock set forth hereinabove and the Family Partnership 90.8 acre farm to HCSB, HCSB shall have no remaining secured claims against the estate and all remaining deficiency claims are treated as a part of the general unsecured Class 10 claims below.

Class 6.    Administrative Claims.    Priority, impaired.    This class consists of the administrative claims of the estate's professionals, quarterly fees of the United States Trustee, and the $17,604 administrative claim of Norman Communications NMB, Inc. ("Norman").    The Debtor will pay in full from his DIP Account any and all quarterly fees due and owing to the Office of the United States Trustee.

The Norman claim relates to post-petition rents on a lease in the Debtor's personal name where the Debtor's wholly owned radio station entity operated through the end of February.    The radio station entity currently continues to operate, and the Debtor is attempting to have the radio station entity pay all or any portion that it can of the $17,604 claim of Norman.

Where necessary, any and all fees of the estate's professionals will be paid only upon Court approval.    There are not currently enough funds contained in the Debtor's DIP checking account to pay the administrative claims of the Debtor.

After the Debtor's payment of quarterly fees of the Office of the United States Trustee and any and all payments from the Debtor's radio station entity to Norman, any and all remaining unpaid administrative claims will be paid over time through the Plan.    After the payment of secured creditors with a lien on such assets, unpaid administrative claimants will receive 100% of sales proceeds from any and all asset sales until administrative claims are paid in full.    Until paid in full, administrative claimants will share pro rata in any distributions.    In addition, until such time as the remaining administrative claims are paid in full, 50% of each annual disposable income payment by the Debtor will be distributed pro rata amongst the remaining administrative claimants.    Any unused portion of the 50% disposable income distribution to administrative claimants, as well as the other 50% of the annual disposable income payments, shall be paid to general unsecured creditors as set forth in Class 10 below.

Class 7.    Joan M. Graham – Alimony.    Priority, unimpaired.    Joan M. Graham is the Debtor's former spouse to whom the Debtor is obligated to pay alimony.    The Debtor is current on the alimony payments owed to Joan M. Graham, and shall remain current on such payments

pursuant to the order/agreement obligating the Debtor to make such payments.

Joan M. Graham has been paid all pre-petition and post-petition alimony payments due her to date, and therefore, Joan M. Graham has no claims against the Debtor's estate other than for his continuing obligation to make such payments.

Class 8.          Horry County Treasurer.          Priority, unimpaired.   The Horry County Treasurer may assert real property taxes with regard to the 8.27 acre Radio Tower property in the approx. amount of $1,396.23, on the Debtor's farm property on Highway 66 at Fox Bay in the approximate amount of $823.74, and on the Ashworth Condo in the approx. amount of $3,583.95.  The property taxes on the foregoing parcels run with the land and shall be paid from the sale price upon the liquidation of any such collateral by the Debtor or their secured creditors. The scheduled property taxes of approximately $3,062.25 with regard to the Clover Court property run with the land and were paid as a part of the Court approved sale of that parcel in February 2010.

Additionally, the Horry County Treasurer may assert real property taxes of approximately $1,913.52 for property taxes on the Debtor's Bear Lake Drive personal residence.  Any and all such outstanding real property taxes will be paid by the Debtor and his spouse in the ordinary course.

Class 9.          Oconee County Treasurer.          Priority, unimpaired. The Oconee County Treasurer may assert some claim for real property taxes with regard to the 12007 West Camelia Dr., Clemson, SC property owned by the Debtor.  Any such property taxes on the foregoing parcel would run with the land and shall be paid from the sale price upon the liquidation of any such collateral.

Class 10.          General Unsecured Creditors.   Unsecured, impaired.   This class consists of all general unsecured creditors of the Debtor, including any contract rejection claims and any remaining deficiency claims of undersecured creditors.  In addition, this class consists of all deficiency portions of guaranty and co-obligations of the Debtor with regard to debts that are secured by property of third party entities but wholly unsecured as to the Debtor and his property.  In addition to the claims scheduled for and/or filed by general unsecured creditors, this class includes any and all of the Debtor's remaining unsecured, deficiency obligations to BB&T, NBSC, HCSB, Beach First National Bank, Waccamaw Bank, Tescor Support Services, Inc., the Class Action Judgment Holders, and any and all plaintiffs in pending litigation.

17

As noted in Class 6 above, allowed administrative claims will receive 100% of the funds remaining after the payment of any secured creditors from any and all asset sales until such administrative claims are paid in full.    In addition, until such time as the remaining administrative claims are paid in full, 50% of each annual disposable income payment by the Debtor will be paid to the Class 6 Administrative Claims until the Class 6 administrative claims have been paid in full.    Until payment in full of Class 6 administrative claims, 50% of each annual disposable income payment shall be distributed pro rata to these Class 10 general unsecured creditors.    Upon payment in full of the Class 6 Administrative Claims, 100% of all remaining annual disposable income payments and 100% of all sales proceeds shall be distributed pro rata to these Class 10 general unsecured creditors

Proceeds for this Class 10 will be distributed pro rata to pay the allowed general unsecured claims upon the Debtor after the final determination of such claims.    The Debtor reserves the right to object to any claim prior to the closing of the case.    The Debtor also reserves its right to bring any potential avoidance actions pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

It is impossible to be precise at this time as to the pro rata percentage payment to general unsecured creditors because of the uncertainty of amounts to be realized by the future liquidation of assets and the uncertainty of the final allowable claims amounts.    After a review of the schedules and the filed proofs of claim in this matter and after taking into account the liquidation of all estate and non-estate property held as collateral by secured creditors, the Debtor estimates that the aggregate amount of known unsecured claims will be between the approximate amounts of $5,000,000 and $12,000,000.    Based on the Debtor's beliefs as to the aggregate value of collateral to be liquidated through the Plan and the annual disposable income payments to be made into the Plan, the Debtor believes that the pro rata payout to unsecured creditors in this matter will be between 5% and 10%.    The Debtor believes the true amount of general unsecured claims in this matter will be closer to approximately $5,000,000, and therefore the Debtor believes and asserts that the pro rata payout to general unsecured creditors will be closer to 10%.

Class 11.    Retention of Assets by the Debtor.        Debtor's Retained Interest, impaired. This class consists of the Debtor.    Pursuant to the Plan described herein, the Debtor will retain his personal residence at Bear Lake Drive, his household goods and furnishings, and the other exempt assets enumerated on Schedule C of his bankruptcy schedules filed in this matter.    The

Debtor's interests in any other property shall be extinguished through the liquidation of his interests of such property through the Plan.

## VI.    LIQUIDATION AND OTHER ALTERNATIVES TO PLAN CONFIRMATION

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case; (b) the Bankruptcy Court could consider an alternative plan of reorganization or orderly liquidation, or (c) the Debtor's Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code.  These alternatives are described briefly below.

Dismissal

Were the Debtor's Bankruptcy Case dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code.  Any secured creditors would be expected to immediately exercise their rights as secured creditors to foreclose and seize the Debtor's assets.  Dismissal would force a race among secured and unsecured creditors alike to seize and dispose of any remaining property of the Debtor. Furthermore, a dismissal of the Chapter 11 case would necessarily upset the agreements outlined herein between the Debtor and his creditors, which agreements are designed to maximize returns to creditors.  Upon information and belief, the Debtor believes that the creditors would quickly obtain and enforce liens against all property of the Debtor, leaving the Debtor with little, if any, assets with value.

Confirmation of an Alternative Plan

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan.  If an alternative plan were proposed, it would more than likely be substantially similar to the current Plan in that it would propose to liquidate or abandon assets under lien to the Debtor's secured creditors, with creditors receiving any remaining funds through distributions to creditors in descending priorities pursuant to the United States Bankruptcy Code.  The Debtor believes that the Plan described herein enables the Creditors and all parties-in-interest to realize the best payout under the circumstances and any other alternative plan would not likely provide any greater return to Claimants.

Chapter 7 Liquidation

      The primary advantage of the Plan over Chapter 7 liquidation is that holders of allowed general unsecured Claims are likely to receive distributions, which would not likely be available, at least not to the same extent, in a Chapter 7 case where the Debtor is not required to pay his disposable income into a plan for five (5) years.  Because the Plan contemplates that: (i) the Bankruptcy Court's involvement will diminish substantially after the Effective Date and (ii) the Debtor's counsel, who is already familiar with the Assets of and Claims against the Estate, shall continue the process of Claims resolution, without the necessity for additional investigation by a Chapter 7 Trustee and his/her separate new professionals, there will not be an additional layer of administrative expenses.  In addition to the sale proceeds and disposable income available for creditors through the Debtor's Plan, the Plan also offers the opportunity of avoiding additional administrative costs and delays that would result from a Chapter 7 liquidation.

      At a minimum, a Chapter 7 Trustee would retain his/her own counsel, who would ordinarily need to devote a substantial amount of time reviewing the status of Claims and getting up to speed on various matters. Such review would include a substantial amount of time duplicating tasks previously performed by other Professionals in the case, thereby increasing both the costs and the time necessary to liquidate the Estate. Also, the statutory fee paid to the Chapter 7 Trustee would further deplete the Estate.

      If this case were converted to a Chapter 7 proceeding, cash distributions, if any, would be delayed for months because the Bankruptcy Court is required to establish an additional bar date for filing proofs of Claim against the Estate. Upon conversion to Chapter 7, unsecured creditors are given additional time to file Claims and governmental authorities are provided even longer to file their additional proofs of Claim. Upon expiration of the Chapter 7 bar dates, particularly given the high number of creditors in this case, the Chapter 7 Trustee and/or his attorney would likely require considerable time to review the Claims and undertake the Claims resolution process. Thus, not only would any dividends paid to creditors suffer because Chapter 7 professional fees would be paid at the expense of these Claims, but unsecured creditors would actually have to wait months longer for any distribution. Consequently, the Debtor believes that the Plan's lower total administrative costs and the more expeditious process of remaining in a

Chapter 11 combine to result in higher recovery for creditors than a Chapter 7 liquidation could ever offer.

## VII.   FEASIBILITY OF THE PLAN

It is provided in 11 U.S.C. §1129(a)(11) that in order for a Plan of Reorganization to be confirmed, it must be demonstrated that the Plan of Reorganization is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor under the Plan unless the liquidation or reorganization is proposed in the Plan of Reorganization.  The Debtor is liquidating substantially all of his assets by way of the Plan, and the Plan is essentially a plan of liquidation with the added component of a payment by the Debtor of his disposable income over the next five (5) years.  Proceeds will be distributed to creditors according to this Plan of Reorganization.  The Plan is feasible because the Debtor and his professionals have the ability to market and sell estate assets and has done due diligence to ensure continued consulting salaries that will be used to fund the Plan's disposable income payment component.

## VIII. TAX CONSEQUENCES

The Debtor believes there are no adverse tax consequences to the Debtor or its creditors as a result of the bankruptcy and the provisions of the Plan but all creditors and parties in interest should consult their respective accountants and/or tax attorneys.

## IX.  CONCLUSION

The Creditors, parties in interest, and readers of this Disclosure Statement are directed to the Plan of Reorganization for specific treatment of their particular claims against the Debtor. The provisions of the Plan satisfy all undisputed claims against the Debtor.

**--Remainder of Page Intentionally Left Blank--**

RESPECTFULLY SUBMITTED on this the 10th day of May, 2010, at Columbia, South Carolina.

MCCARTHY LAW FIRM LLC

BY:    /s/ Daniel J. Reynolds, Jr.
G. William McCarthy, Jr., I.D. #2762
Sean P. Markham I.D. #10145
Daniel J. Reynolds, Jr. I.D.#9232
Attorneys for the Debtor
1715 Pickens Street (29201)
Post Office Box 12287
Columbia, South Carolina  29211
Tele:  (803) 771-8836
Fax:  (803) 779-0267

**EXHIBIT  A**

***Harvey and Selene Graham***
***Worksheet on Income and Expense***
***Estimates for Schedule I and Schedule J***

| | | Harvey Graham, Jr. | Selene Graham | Total Income |
|---|---|---|---|---|
| **Income** | | | | |
| Monthly Income | | | | |
| Salary Graham Brothers Farm Supply | | $ 3,000.00 | | $ 3,000.00 |
| Salary Carolina Linen Supply, Inc (Net) | | $ 3,135.77 | | $ 3,135.77 |
| Social Security Income | | $ 1,836.00 | $ 1,007.00 | $ 2,843.00 |
| Quarterly Income | | | | |
| BB&T Dividend | | $ - | | $ - |
| Annual Income | | | | |
| Tobacco Buyout Program (4 additional Years starting in 2011) | $16,845.50 | $ 1,403.79 | | $ 1,403.79 |
| Graham Family Investments, LP | | $ 600.00 | | $ 600.00 |
| **Total Monthly Income** | | $ 9,975.57 | $ 1,007.00 | $ 10,982.57 |
| **Expenses** | | | | |
| Monthly Expenses | | | | |
| Utilities | | $ 465.00 | | $ 465.00 |
| Telephone, Cable & Internet | | $ 247.69 | | $ 247.69 |
| Medical Insurance | | $ 223.84 | | $ 223.84 |
| Water and Sewer | | $ 29.45 | | $ 29.45 |
| HOA Dues | | $ 185.00 | | $ 185.00 |
| House Maintenance Bear Lake Drive | | $ 250.00 | | $ 250.00 |
| Alimony | | $ 1,498.00 | | $ 1,498.00 |
| Out of Pocket Medical (Drugs, Doctors, & Hospital) | | $ 1,750.00 | $ 528.00 | $ 2,278.00 |
| Food | | $ 500.00 | | $ 500.00 |
| Personal Care | | $ 250.00 | | $ 250.00 |
| Vehicle Expense | | | | $ - |
| Fuel Cost | | $ 100.00 | | $ 100.00 |
| Lease | | $ - | $ 476.55 | $ 476.55 |
| Vehicle Repairs | | $ 75.00 | | $ 75.00 |
| Clothes | | $ 100.00 | | $ 100.00 |
| | | | | $ - |
| Annual Expenses | | | | |
| Property Taxes Bear Lake Drive | $ 2,104.87 | $ 175.41 | | $ 175.41 |
| Insurance Bear Lake Drive | $ 3,344.00 | $ 278.67 | | $ 278.67 |
| Vehicle Insurance | $ 1,335.00 | $ 111.25 | | $ 111.25 |
| Insurance Ashworth | $ 500.00 | $ 41.67 | | $ 41.67 |
| Taxes Ashworth | $ 3,942.35 | $ 328.53 | | $ 328.53 |
| Life Insurance Priemums | $ 7,030.84 | $ 585.90 | | $ 585.90 |
| Proposed House Payment Bear Lake Drive | | $ 1,900.00 | | $ 1,900.00 |
| Ashworth Expenses | | | | |
| Payment NBSC | | $ 810.06 | | $ 810.06 |
| HOA Dues | | $ 509.00 | | $ 509.00 |
| Utilities | | $ 71.98 | | $ 71.98 |
| **Total Expenses** | | $ 10,486.44 | $ 1,004.55 | $ 11,490.99 |
| **Net Cash Flow** | | | | $ (508.43) |
| Cash Flow upon the sale of the Ashworth | | | | |
| Ashworth Expenses | | | | |
| Insurance Ashworth | | | | $ 41.67 |
| Taxes Ashworth | | | | $ 328.53 |
| Payments NBSC | | | | $ 810.06 |
| HOA Dues | | | | $ 509.00 |
| Utilities | | | | $ 71.98 |
| **Total Ashworth Expenses** | | | | $ 1,761.24 |
| **Net Cash Flow** | | | | $ 1,252.81 |